May it please the Court, my name is Kim Van Amberg of Snell and Wilmer, representing the Petitioner, Emanuel Agyeman. Because of my uncertainty about the pronunciation, I'm going to refer to him as Petitioner. Given that this case grew out of a 2002 panel decision of this Court, if it's helpful to the Court, I'll briefly summarize the procedural history and the history subsequently. I think you can assume we're familiar with it. All right. The issues on appeal are whether, given the circumstances and the denial of due process in the 1997 adjustment of status hearings, the government's position in 2002 that the death of the Petitioner's wife, Barbara Levy, in 1999, two years after the original denial of due process, whether the government should be stopped from taking that position. Why would the government be stopped? There has to be some – wouldn't there have to be some misconduct or misleading action on the part of the government in order for there to be a stopple? The government admits that negligent conduct, including misinformation, may give rise to a stopple. In this case, the 2002 Agyeman opinion found that the immigration judge in 1997 gave Petitioner repeatedly about what was required of him to establish his entitlement to adjustment of status, in particular that the immigration judge did not assist him in developing the record and repeatedly told him that the only way he could establish his entitlement to adjustment of status was to have his wife present at the hearing and have her testify that she still loved him. But wasn't that all taken care of by the 2002 decision? The 2002 decision explained what the immigration judge could do to correct the situation in terms of allowing a full and fair hearing. And he was given a new hearing. He was given a new hearing. And at that point, the government stated that he was no longer entitled to a new hearing because his wife had died. Because his wife had died, and he had two years after she died to file a widower's petition. And he hadn't done that. He hadn't. Is it your position that the government did some affirmative act to stop Mr. Agyeman from learning that his wife had died? No, Your Honor. The record does show that he learned that his wife had passed away in January 2003, approximately four years after she passed away. And what facts are there in the record which indicate that the government did anything to stop Mr. Agyeman from learning from 1999 to 2003 that his wife had died? The government, it does not appear from the record, did anything to keep him from learning that. Are there any facts which show that Mr. Agyeman was using due diligence to find out whether his wife was alive or dead and did everything he could to find out whether she was alive and still couldn't find out? Was he incommunicado all that time? He was during part of that time, in both the 1997 hearings and the 2002-2003 hearings. Wasn't he incommunicado enough not to be able to contact his wife in 1997 from the detention facility and ask her to give evidence in his case? So he could contact her from jail. What facts are there that he was incommunicado to the point that he could not learn that his wife had died? There are references in the record, both in 1997 and 2002 and 2003, that he had attempted to make contact with her, that he had sent her letters that had not been responded  Could you give me those ER citations, please? Yes. In 2002, the record excerpts at pages 112, 113. But by 2002, she was three years dead. She was. In 1997, he continued to have he made numerous attempts to reach her that are reflected on the record at page 35, 66, and 79. There are references that he. What evidence is there for the two-year period between 1999 and 2001, which is when the two years runs and he can't apply for adjustment of status under the widower's application? What evidence is there that between 1999, her death, and 2001, the end of the two-year period, he attempted to communicate and find out whether she was alive? There's no evidence, in part because the immigration judge declined to hear his equitable estoppel or his equitable tolling and estoppel arguments in 2003. Had the immigration judge evaluated those arguments that he made in response to the government's motion to pre-termit, there might be a developed record on what steps he had taken in that interim to remain in contact with his wife, whether he was in contact with her family and could have learned of her death prior to 2003. Was there anything in the record to show that his wife tried to contact him? There are statements from him that at various times he had communicated to her that he would like for her to travel to Arizona for the hearings, but you can't tell from the record excerpts what exactly the communication was. I didn't quite get your point. The immigration judge's action in 2003 prevented Mr. Ajuman from contacting his wife between 99 and 01. How did that happen? I don't think I was very clear with my point. In 2003, when the government filed its motion to pre-termit, the case had been remanded, and so there hadn't been hearings held between 99 and late 2002. So there is no record during that time period of what steps he took to maintain contact with his wife. The immigration judge, in response to Mr. Ajuman's arguments of equitable estoppel and or equitable tolling and estoppel, declined to hear arguments and evidence on those issues. So his granting of the government's motion to pre-termit resulted in there being no evidence taken from Mr. Ajuman on these very issues in the 2002-2003 hearings. In addition, on the issue of equitable estoppel, a panel of this Court in this year after the briefing on questioning. I'm trying to follow your reasoning. Let's say that in 03, the I.J. declined to hear arguments on equitable estoppel and tolling. But that was two years after the period had run out. What prevented Mr. Ajuman from contacting his wife and learning that she had died in the period of time 99 to 01? I can only base my answer on the earlier. On the record. On the record. What does he say about that, and where does he say it? He says at pages 43, 53 to 55, 35, 66, 79, he discusses his efforts to contact her, her hospitalizations, and he explains that her illness would sometimes result in her staying with family members or being hospitalized such that his contacts to her, although it appears that he had some contacts with her in the 1997 time frame, many of his contacts to her went unresponded to. He sent her letters. She didn't respond to them. He attempted to contact her, but being incarcerated and apparently not. He was incarcerated all during this time? He was incarcerated from 1997 to November of 2004. All right. As it relates to the estoppel argument, a decision of the panel of this court this year after the briefing on this case closed is instructive. I provided a copy of that to counsel for the department this morning, Salgado Diaz v. Ashcroft. In that case, although it's not factually on point, it's certainly conceptually on point. The petitioner for asylum was stopped, he alleges, illegally removed from the country. He reentered the country illegally, and thus his removal proceedings were started from the beginning. The government took the position that the legal reentry was a new and independent basis for removing him. The panel of this circuit held that the government was estopped to rely upon circumstances that were made more favorable to the government due to an earlier due process violation. The panel also held go ahead. Well, I have another question about whether there is a rule by statute when the dead wife dies, there's not automatic revocation. It's under a rule of the agency. It says upon the death of the petitioner, here Adjaman's alleged wife, unless the attorney general, it's automatic revocation, unless the attorney general in his or her discretion determines that for humanitarian reasons, revocation would be inappropriate. Are you claiming that because he was unable to present the evidence about his inability to contact his wife, that would be a humanitarian reason for not automatically revoking? Well, I think two things. One, I don't think the Department exercised its discretion. I think an exercise of discretion would have involved an evaluating of the equities in this particular situation, and the fact that the petitioner would not have been stuck in the system in 2002, arguably, had he not been denied his due process rights in 1997 and had the opportunity to present whatever level of evidence he could garner from his wife at the time that she was living. But it doesn't say that the Department has the discretion. It says the attorney general has the discretion. So my question is, is this a case where it should be remanded for the attorney general to exercise his discretion based upon humanitarian reasons, based upon the fact that the evidence was not allowed to show equitable estoppel? Is that too confusing? No. I think that actually I see that my time is up. If I am permitted to answer my question. Okay. I think that a remand for the attorney general's exercise of his discretion would be appropriate. I also think that the case law, which is slim, arising under that particular Federal regulation, provides some support for not allowing a wooden application of that particular regulation, and particularly under these circumstances where the man is stuck in the system several years later. Also, why would the attorney general have to exercise discretion? The attorney general – I mean, the regulation doesn't require in every case that the attorney general exercise discretion. The regulation provides for a humanitarian exception that was not addressed by – Was it requested? It was not. It was – So why would the attorney general be expected to sua sponte, or respond in a way that was not requested? Petitioner was proceeding pro se during the proceedings, and he raised inartfully the issues of estoppel, equitable tolling, and the fact that he was in kind of an in the system five years later, faced with this new argument that wasn't available in 1997 had he been afforded his due process rights. I think under those circumstances, the estoppel and the equitable tolling arguments should prevail, and particularly in light of the Salgado Diaz. All right. Thank you, counsel. You've exceeded your time, but we will give you one minute for rebuttal. Thank you very much. Good morning, Your Honors, and may it please the Court. Margo Nadel from the United States Attorney General. The instant petition for review should be denied because – Could you please keep your voice up? Oh, sure. The instant petition for review should be denied because the petitioner in the instant case is statutorily ineligible for the relief that he's seeking. In order to be eligible for adjustment of status, he would have needed to have filed his petition as a self-petition within two years of his wife's death. His wife died in May of 1999. No self-petition, no widower self-petition was filed within two years. But what about the fact that he was not able to introduce evidence as to the possibility of equitable estoppel here? He – I think that equitable estoppel as opposed to equitable tolling here, if we can make the distinction, in order to raise equitable estoppel, he would have had to have shown some sort of affirmative misconduct by the immigration judge. And the – this – this court has defined affirmative misconduct to include conduct such as a deliberate lie. There was no such – no such conduct here. What about equitable tolling? Equitable tolling would not be available in the instant case because there's no due diligence. The – Mr. Agyeman basically sat on his rights. He was able to get in contact with his wife during the 1997 hearings, or at least according to his statements, he was. And there are repeated statements on the record that Judge Kleinfeld, I think, noted in his dissent in Agyeman 1 that indicated he actually was able to get his wife to come to Phoenix, but because he was segregated from the rest of the prison population due to a dispute that he had with some of the prison guards, he wasn't able to get in contact with her to bring her to the hearing. But in any event, he was able to contact her if – if one is to credit the testimony that – that he gave. And although she was, according to his testimony, in and out of mental institutions, there's no evidence in the record that he perhaps tried to contact her family members or his own family members in an attempt to – to get information about whether his spouse, the woman he claimed he planned to establish a life together with, the woman who was the basis for all of his immigration relief, whether she was still alive. May I ask a question? Sure. Was the issue of equitable tolling raised before the immigration judge or the BIA, or was it raised here for the first time? No, it was raised before, Your Honor. It was raised before. But again, the – the equitable tolling claim is – is meritless because this court has repeatedly held that in order for equitable tolling to be applied, there has to be due diligence on the part of the party seeking equity. And there just is virtually no evidence in the record that that due diligence took place in the instant case. Moreover, we would note that the Petitioner can't assert a due process claim in the instant case because the relief that he's seeking is discretionary. This Court held very clearly in Rashtabadi v. INS that discretionary relief – that rather, adjustment of status is, quote, purely discretionary. And this Court has held in several cases – But does it have to be requested? In other words, Judge Rawlinson asked the question whether or not he had requested discretionary relief. And the answer was that he had not. Is this required? Yes, Your Honor. I would say that it is required. And to the extent that – to the extent that there is any issue of discretionary relief, there certainly were no humanitarian factors presented by the alien. I know during testimony in the 1997 hearings, the immigration judge did attempt to elicit what kind of factors would be considered, I guess, for a suspension of deportation. But wouldn't that be up to the Attorney General to decide? It would be up to the Attorney General to decide. I think we're straying a little bit far from the point about the due process claim and whether or not there's a protected liberty interest that he can even assert here, because the adjustment of status is subject to the unfettered discretion of the Attorney General, meaning that the Attorney General can decide as a matter of pure discretion that he does not wish to grant an alien adjustment of status. And yes. One quick question. Sure. On your brief at page 8, note 6, you say that Asherman has no protectable due process interest in this case. Yes. Well, we have previously held in this very case that he had a due process interest. What about the law of the case? An excellent question, Your Honor. And what we would argue here is that based on subsequent case law that's come out since Adjuman 1, numerous cases from this Court involving voluntary departure and numerous cases from other circuits involving even asylum, because there's that discretionary component, there's no protected liberty interest. One cannot claim an expectation of relief in something that's ultimately going to be subject to the unfettered discretion of the Attorney General. So the law of the case doesn't apply here? Your Honor, I think that the principles of Adjuman 1 have been significantly eroded by case law that's come out since Adjuman 1. And in the cases that we've cited in our brief that deal with discretionary relief and due process. I understand your answer. Counsel, as a practical matter, for each circumstance where the Attorney General has discretion, is that matter brought to the Attorney General's attention as a matter of course? How does that work? No. I mean, it's understood that the immigration judges are familiar with the law. They are familiar with the fact that they have discretion to grant or not grant. I'm talking about the immigration judges. Oh, sorry. I said the Attorney General. In matters where the Attorney General has been bestowed discretion. Okay. Is each of those matters brought to the attention of the Attorney General as a matter of course? I guess the reason why I was referring to the immigration judges is because the Attorney General's authority to grant adjustment of status or to exercise his discretionary authority is delegated to the immigration judges. In this particular case, we were talking about the discretion to extend the ability of a widowed spouse to seek asylum. Right. Which is not vested in the IJs, is it? I thought it was the sole discretion of the Attorney General. I believe that the Attorney General has delegated that authority to the immigration judges, but I can certainly find out for you. But my understanding is that the immigration judge would have the authority to. So it's your, and I'm not sure about this. That's why I'm asking. It's your representation that even when there is a regulation that says something is in the sole discretion of the Attorney General, that is generally delegated to the IJ? That is my impression, Your Honor. I'd hesitate to make a blanket statement, but that would be my understanding that the immigration judge would have authority. But I can certainly follow up. So in this case, the Petitioner could have sought the humanitarian exception from the IJ? I believe so, Your Honor, yes. I see my time is running out, and I did want to point out something in the interest of candor to the Court. On Sunday, I discovered that the Petitioner in the instant case, there's evidence to suggest that he actually was divorced from his United States citizen wife in 1993, well before Edgmon won, well before this case. And as such, if this case were to be remanded, he would still be ineligible. But we can't consider that, can we? It's extra record evidence, and it's merely being pointed out because it's information that we have that the Court should consider. In the event that the Court decides to remand, there really is no relief available in that, or it appears that there's no relief available in that we have information that indicates that he was divorced as of 1993. Counsel, back to my other question. I would find it very helpful if you could cite to the authority that the Attorney General has delegated either to the BIA or the IJ the authority to make humanitarian exceptions. I will find that authority for you. Thank you. I will follow up with that. In conclusion, Your Honors, for all of the reasons that I've discussed, the petition for review should be denied. The Petitioner was not eligible for the relief that he sought. An additional hearing would not have changed that. And in a case where an individual has failed to exercise due diligence, he is not entitled to equitable relief. All right. Thank you, counsel. Rebuttal. Counsel, before you start your rebuttal, on behalf of the Court, I would like to thank you for your pro bono efforts on behalf of this Petitioner. You're very welcome. Very briefly, as it relates to the alleged divorce, in addition to the fact that it's not a part of the case. In addition to the fact that it's not a part of the record, this Court has held that a dissolution of a marriage that occurs sometime after the marriage was established is not a basis for denying adjustment of status. And as this Court held, the panel of this Court held in the first Adjuman case, the question is whether the couple married in good faith with an intent to live together at that time as husband and wife. As it relates to the issue of equitable or, I'm sorry, equitable tolling, this Court has held that error of some kind combined with due diligence can justify equitable tolling. We have error in the 1997 denial of due process that, from a purely equitable and not necessarily legal standpoint, doesn't seem should be used to punish Adjuman later on. I'm having difficulty following you. We all agree that the IJ was wrong the first time around and did not grant procedural due process, and that's why we reversed in 2002. But why does the refusal to allow evidence, other than with the presence of Mrs. Adjuman, create an estoppel as to Mr. Adjuman contacting his wife and knowing that she's died? I mean, one thing is presenting her testimony by affidavit or by telephone, and the other thing is knowing whether she's still alive. Please clear that up for me. I will, and I see that the red light is on, so I'll do so briefly. Well, go ahead. The immigration judge, as an initial matter, told him that he probably wouldn't be able to have anyone testify by telephone. And I don't try to connect his inability to make contact with his wife with an attempt to stop the government from asserting this position. But what I am attempting to do is to take the principle from cases like the Salgado Diaz case from earlier this year that says the government should be estopped from taking a position seeking to take advantage of a due process violation and the circumstances created by that. But the due process violation does not allow you to testify by telephone. Fine. We reversed. But that didn't stop him from contacting her and finding out that she was not alive. That didn't stop him from contacting her, but the record is replete with him making attempts to contact her. So we don't know. I was trying to look at those citations of yours, and I'll ask for a record of the pages you cited, but I didn't find anything on page 43, 53, or 55. Well, I was using the record excerpt from my record as we had paginated it. Thank you very much. All right. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the Court.
judges: D.W. Nelson, Rawlinson, Bea